**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**SADE ABDIASIIS,**

        **Plaintiff,**              **Case No. 2:20–cv–3315**
                              **Judge Edmund A. Sargus, Jr.**
    **v.**                        **Magistrate Judge Elizabeth Preston Deavers**

**SHEILA LEWIS, et al.,**

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Cynthia Cameron, JaNina Davis, Elizabeth Givens, Sheila Lewis, and NaphCare, Inc.'s (collectively, "Defendants") Motion for Summary Judgment (ECF No. 73) and Plaintiff Sade Abdiasiis' Motion to Strike Reply (ECF No. 84). For the following reasons, the Court **GRANTS in part and DENIES in part** the Defendants' Motion for Summary Judgment and **DENIES** Plaintiff's Motion to Strike.

### I.      STATEMENT OF FACTS

This case concerns the alleged negligence and deliberate indifference of NaphCare medical staff at Franklin County Correctional Center II ("FCCC") towards Plaintiff Sade Abdiasiis from September 8, 2019, to September 11, 2019. NaphCare, a private corporation, provides medical services to FCCC inmates. Abdiasiis began serving a 74-day sentence at FCCC on August 12, 2019. (Alvarez Dep. at 185, ECF No. 68.) He was placed on a detox assessment for opiate withdrawal on August 15, 2019. (Horton Dep. at 10–11, Ex. 12, ECF No. 70-1.) He was also placed on GERD/Indigestion protocol for nausea on August 23, 2019, and treated for heartburn for seven days. (Alvarez Dep. at 1, Ex. 2; Horton Dep. at 18–19, Ex. 15.)

### A. Abdiasiis Reports Symptoms to Nurse Lewis

On September 8, 2019, Abdiasiis allegedly began suffering from severe nausea, vomiting, sharp lower back pain, chest pain, and difficulty breathing. (Abdiasiis Dep. at 82, ECF No. 68.) Other inmates allegedly noticed that he "did not look right," looked dehydrated, and his pupils were dilated. (*Id.* at 98.)

That night at 8:25 p.m., Defendant Sheila Lewis, a licensed practical nurse (LPN) and NaphCare employee, walked around FCCC to administer medications and allow inmates to report urgent medical concerns, a routine called "med pass." (*Id.* at 98–101; Lewis Dep. at 7, 122, ECF No. 67.) During med pass, Abdiasiis reported his symptoms and pain to Nurse Lewis and submitted a written sick call request to see a doctor. (*Id.*; Sick Call Request, ECF No. 57-1.) Abdiasiis alleges that Nurse Lewis did not perform a physical evaluation or place him on the sick call list to see a doctor. (Lewis Dep. at 124–25.) Nurse Lewis does not remember if she provided treatment or any other further action. (Lewis Dep. at 39–42, 87.)

### B. Abdiasiis Reports Symptoms to Nurse Lewis a Second Time

Later that night, during the 3:00 a.m. med pass, Abdiasiis complained again to Nurse Lewis about his symptoms. He told her that he had been vomiting all day, was experiencing stomach pain, and asked to go to the hospital. (Lewis Dep. at 41–42.) Nurse Lewis took his vitals and found that his blood pressure was within a normal range but his pulse was elevated. (Med Pass Notes, ECF No. 57-1 at 8, 11.) Lewis alleges that Abdiasiis did not show symptoms of vomiting, he did not look pale, and he was not guarding his stomach. (Lewis Dep. at 52–53.) She gave him fluids. (*Id.* at 45–46.) She allegedly told him that medications were not available and to stop faking the pain. (Aden Dep. at 36, ECF No. 61.) Lewis did not put Abdiasiis on the sick call list at that time. (Sick Call Log, ECF No. 57-1 at 5.) At the end of the visit, Abdiasiis stood in the doorway and

refused to move until they took him to the hospital. (Lewis Dep. at 44, 48.) FCCC deputies ordered him to step aside and then turned off all the televisions in the section as punishment for Abdiasiis' "back-talking." (Med Pass Notes at 8, ECF No. 57-1.)

### C. Abdiasiis Fakes a Seizure and is Evaluated by Nurses Lewis and Bennington

At 4:00 a.m., an hour later, Plaintiff admittedly faked a seizure to receive medical attention. (Abdiasiis Dep. at 99.) FCCC staff, including Nurse Lewis, found him unresponsive on the floor and woke him with an ammonia inhalant. (Lewis Dep. at 64.) They put him in a wheelchair and took him for further evaluation with a NaphCare Charge Nurse, Astacia Bennington, LPN. (*Id.* at 66; McClain Dep. at 43, ECF No. 64.) The nurses took Abdiasiis' vitals, which were allegedly normal, and returned him to his cell. (Lewis Dep. at 14, 16.) Abdiasiis alleges that they sent him back with Gatorade and did not conduct any examination. (Abdiasiis Dep. at 95.) Nurse Lewis alleges that she never believed Plaintiff's condition was urgent and she only took him to see the Charge Nurse to make sure she had not overlooked anything. (Lewis Dep. at 80.) Nurse Bennington put Abdiasiis on the sick call list and listed the request as "routine" rather than "priority" or "needs to be seen immediately." (Sick Call Log at 5, ECF No. 57-1.) "Routine" requests are usually addressed in 48 to 72 hours from the time of request. (Alvarez Dep. at 39–41.)

### D. Abdiasiis Reports Symptoms to Nurse Davis

The next morning, on September 9, 2019, Abdiasiis still felt sick in his bed and continued to vomit. (Abdiasiis Dep. at 102.) He reported his symptoms to Defendant Nurse JaNina Davis, LPN, during a med pass and gave her a sick call card. (*Id.* at 162.) Nurse Davis gave him Ibuprofen at 8:39 a.m. but does not remember if she examined him or gave further treatment. (Abdiasiis Dep. at 97; Davis Dep. at 7, Ex. 8, ECF No 62-1.) Abdiasiis avers that Nurse Davis did not examine or treat him for his symptoms.

### E.  Abdiasiis' Mother Calls Nurse Cameron and Nurse Givens at NaphCare

Abdiasiis' cellmate reached out to Abdiasiis' mother, Sagal Aden, mid-day on September 9, 2019, and told her that Abdiasiis was very sick, he was vomiting and his pain was so severe that he could not stand. (Aden Dep. at 32, ECF No. 61.) Ms. Aden spoke with that Plaintiff's cellmate on the phone multiple times. (*Id.* at 33.) Aden then called NaphCare and spoke to Nurse Cynthia Cameron, RN, the supervising nurse at the time. (Aden Notes, ECF No. 79-2.) Nurse Cameron told her a nurse would go check on Abdiasiis but no nurse went to check on him. An hour and a half later, Aden called again and spoke to Defendant Nurse Givens, LPN, who also told her that a nurse would go check on him. (*Id.*; Givens Dep. at 146, ECF No. 59.) Nurse Givens told Cynthia Cameron, RN, about Aden's calls but no nurse went to check on him.

Over the course of the afternoon, Aden called fifteen times and was told that NaphCare could not divulge any details of her son's treatment because of patient confidentiality under HIPPA. (Givens Dep. at 59; Lewis Dep. at 11.) Eventually, Aden and Abdiasiis or his cellmate made a three-way call with NaphCare to ask for medical treatment. Such calls violate jail policy. (Cameron Dep. at 8, ECF No 57-1; Abdiasiis Dep. at 128–30.) Aden and Abdiasiis briefly spoke to Nurse Cameron before she hung up the phone. (*Id.*) Nurse Cameron alleges that she reviewed Abdiasiis' chart and saw that no abdominal exam had been performed and that he had not been seen by an RN or advanced practitioner yet. (Cameron Dep. at 127.) She informed FCCC deputies that Plaintiff had made a three-way call with NaphCare against jail policy. Four corrections officers threatened to put Abdiasiis in isolation and charge him with harassment if he called again. (Progress Notes, ECF No. 57-1 at 8; Aden Dep. at 24–25.)

### F. Abdiasiis Reports Symptoms to Nurse Simon

NaphCare LPN Gabrielle Simon was responsible for the night shift on September 9th and 10th. (Alvarez Dep. at 157.) Abdiasiis complained to Nurse Simon that he had severe nausea, vomiting, and bad stomach cramps. (Sick Call Request at 4, ECF No. 57-1.) There is no documentation that Nurse Simon took Abdiasiis' vitals or performed an examination. (*See* ECF Nos. 67-1, 68-1, 57-1.) Nurse Simon entered Abdiasiis' request on the sick call list but later canceled it as duplicative of the first sick call entry made by Nurse Bennington. (Sick Call Log, ECF No. 57-1 at 5; Simon Dep. at 41, ECF No. 66.)

### G. Nurse Davis Gives Abdiasiis Medication

On September 10, 2019, at 8:30 a.m., Nurse Davis gave Abdiasiis Ibuprofen during the morning med pass. (Davis Dep. Exs. 8, 20.) She alleges that she does not remember whether Abdiasiis made any verbal complaints to her. (*Id.* at 209, 228.)

Later that night, Abdiasiis submitted an additional sick call request to Nurse Davis, stating, "I am suffering severe nausea, keep vomiting, having very bad stomach cramps, need some type of electrolytes, very dehydrated. Please help. Keep putting in call card." (Davis Dep. Ex. 4, ECF No. 62-1.) NaphCare records show that a nurse visited him at 9:29 p.m. but there are no details of that visit. (*Id.*)

### H. Abdiasiis Sent to Emergency Room and Diagnosed with Pancreatitis

On September 11, 2019, Carolyn Horton, PA, evaluated Abdiasiis at 10:52 a.m. and immediately sent him to the emergency room. (ER Referral, ECF No. 57-1 at 11.) PA Horton found that Abdiasiis' abdomen was distended and tender to palpation and the situation was "urgent" and "alarming." (Horton Dep. at 173, 174, ECF No. 70; Progress Notes, ECF No. 57-1 at 7–8.) His vital signs showed that his pulse was elevated. (Vital Signs, ECF No. 67-1.) PA Horton

believed that Abdiasiis could be suffering from pancreatitis, appendicitis, or peritonitis. (*Id.* at 183–84.)

At the hospital, Abdiasiis had an elevated pulse and high blood pressure. (ECF No. 79-1 at 6.) He was diagnosed with necrotizing pancreatitis, sepsis, hyperglycemia, partial renal failure, systematic inflammatory response syndrome (SIRS), venous thrombosis, severe diabetes, and infected fluid collections. (ECF No. 79-3 at 11.) Abdiasiis was treated in the hospital for 41 days. He was released on October 22, 2019, but readmitted on October 28, 2019, for additional complications. Abdiasiis developed insulin-dependent diabetes and continues to require regular medication. (Abdiasiis Dep. at 118–199, 133.)

### I. Procedural History

On June 30, 2020, Abdiasiis filed a Complaint in this Court against four nurses who treated him at FCCC: Defendants Sheila Lewis, LPN, Janina Davis, LPN, Elizabeth Givens, LPN, Cynthia Cameron, RN, (hereinafter, the "Individual Defendants"). He also filed suit against the Individual Defendants' employer, NaphCare, Inc. Plaintiff asserts that Defendants' inadequate and delayed medical treatment deviated from the standard of care, and their actions subjected him to extreme pain and suffering and increased the severity of his health complications. (See Complaint, ECF No. 1.)

Defendants filed the instant motion for summary judgment on May 2, 2022 (ECF No. 73). Plaintiff responded (ECF No. 79) and Defendants replied (ECF No. 80). Plaintiff and Defendants thereafter filed several additional responses (ECF No. 81–85) including a motion to strike one of the responses (ECF No. 84). The motions are ripe for review.

## II.    STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### IV.    SUMMARY JUDGMENT ANALYSIS

**A.  Plaintiff's Claims Against Individual Defendants Lewis, Davis, Givens, and Cameron**

**1.  Eighth Amendment Claim**

A convicted person's claim for inadequate medical care arises out of the Eighth Amendment, which "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004), quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on an Eighth Amendment claim, plaintiffs must prove both objective and subjective culpability. *Linden v. Washtenaw Cnty.*, 167 F. App'x 415 (6th Cir. 2006). The objective component requires the plaintiff to show that "the medical need is sufficiently serious." *Id.* (internal citations omitted). The subjective component requires the plaintiff to show that the prison official was deliberately indifferent to inmate health or safety. *Id.* at 415–16, citing *Estate of Novack v. Cnty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (quotations & citation omitted).

#### a.  Medical Need Was Sufficiently Serious

Defendants argue that Abdiasiis did not have an obviously serious medical condition because Nurse Lewis thought he looked ill, Abdiasiis never showed proof that he was vomiting, and his vitals were within a normal range from September 8th to 11th. (Def.'s Mot. at 24–26.) Abdiasiis argues that the seriousness of his medical need was evident by his repeated complaints of severe pain, nausea, and vomiting, and his multiple attempts to see a doctor or go to the hospital. He also asserts that his vitals were abnormal. (Pl.'s Mot. at 26.)

There is a genuine issue of fact as to whether Abdiasiis had a medical need that was sufficiently serious. Plaintiff's experts opine that his vitals throughout the three days show an

elevated pulse and tachycardia, symptoms of a serious medical issue. Plaintiff reported orally and in writing to the nurses that he suffered from stomach pain, nausea, vomiting, and dehydration. He repeatedly asked to see a doctor or to go to the hospital. *See Blackmore*, 390 F.3d at 899 (finding repeated complaints of "sharp" and "severe" stomach pains for several days and vomiting indicated a serious medical need). Despite his reported symptoms, PA Horton was the first medical professional to perform an abdominal exam. She immediately sent Abdiasiis to the emergency room. *See Meador v. Growse*, No. 12-cv-120, 2014 WL 970105, at *4 (E.D. Ky. March 12, 2014) (collecting cases finding that pancreatitis is a serious medical condition).

Furthermore, a plaintiff has a serious need for medical care if it is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* (citing *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). Abdiasiis' cellmate called his mother multiple times after he allegedly could not stand up, his pupils were dilated, and he "did not look right." From this, a reasonable juror could find that the medical need was serious because his cellmate, a layperson, recognized his need for medical attention. Plaintiff meets the objective component.

### b. Deliberate Indifference

To establish the subjective component, deliberate indifference, a plaintiff must show sufficient evidence that "the official being sued perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001); *see Farmer*, 511 U.S. at 837. The Supreme Court has defined deliberate indifference as "lying somewhere between the poles of negligence at one end and purpose or knowledge at the other" and it is "routinely equated ... with recklessness." *Farmer*, 511 U.S. at 836. "In other words, a plaintiff 'does not need to show that

the [defendant] acted with the very purpose of causing harm or with knowledge that harm will result.'" *Bonner–Turner v. City of Ecorse*, 627 F. App'x 400, 407 (6th Cir. 2015) (quoting *Farmer*, 511 U.S. at 835). Additionally, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014) (quoting *Farmer*, 511 U.S. at 842).

### i. Defendant Sheila Lewis, LPN

Defendants argue that Plaintiff cannot establish that Nurse Lewis was deliberately indifferent to his serious medical needs because 1) there is no evidence to demonstrate Nurse Lewis had a sufficiently culpable state of mind in denying medical care to Plaintiff, 2) Nurse Lewis actually provided care for Plaintiff based upon his presenting symptoms, and 3) she conducted care pursuant to her professional and clinical judgment as well as her training. (Def.'s Mot. at 32.)

Nurse Lewis' first interaction with Abdiasiis occurred during med pass on September 8th, around 8:30 to 9:00 p.m. She reviewed and signed his sick call request, which reported severe nausea, muscle aches, back pain, chest pain, difficulty breathing, and vomiting every hour. Nurse Lewis gave him Ibuprofen.

Nurse Lewis's second interaction with Abdiasiis occurred during the 3:00 a.m. med pass on September 9, 2019. She testified that he complained of stomach pains and vomiting, asked for medication, and requested to go to the hospital. Nurse Lewis testifies that Abdiasiis did not produce proof of vomiting, he did not guard his stomach, he did not look pale or in pain. Without evidence of vomiting, she believed he may have been lying about his symptoms. Nurse Lewis took Plaintiff's vitals and claims they were within overall normal range and not concerning. Plaintiff's expert, however, opines that the vitals indicate that his pulse was high and he was tachycardic. (Ex. 3, Cohen Report at 3.) Nurse Lewis gave him Gatorade and told him he was on the list to see

a doctor. She did not perform a physical examination of Plaintiff's abdomen. After she refused to send him to the hospital or to see a doctor, Abdiasiis stood in the doorway and would not let the corrections officers close the door.

Nurse Lewis's third interaction with Abdiasiis was in response to a Code Blue at or around 4:00 a.m. on the morning of September 9, 2019, after deputies had found Plaintiff lying on the floor, suffering from an apparent seizure. She sent Abdiasiis to another LPN, the supervising Charge Nurse, for a secondary assessment. Nurse Lewis asserts that she took Plaintiff's vitals again and they were within normal ranges. Plaintiff contends that she copied his earlier vitals instead of taking new vitals and still failed to perform an examination of his abdomen.

Viewing the evidence in a light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Nurse Lewis was deliberately indifferent to his medical needs. Despite Plaintiff complaining three times that he had severe abdominal pain, nausea, and vomiting, Nurse Lewis did not add him to the sick call list to see a doctor immediately. She believed he was faking his symptoms. *See Adkins v. Morgan Cnty., Tenn.*, 798 F. App'x 858, 862 (6th Cir. 2020) (when a defendant is "directly informed" of a patient's symptoms but disregards the risk based on a belief that the patient was "faking," that is sufficient to satisfy the subjective component); *Jones v. Muskegon Cnty.*, 625 F.3d 935 (6th Cir. 2010) (failure to respond to request for medication treatment or call for consultation or examination because symptoms dismissed as "faking it" was deliberately indifferent).

Furthermore, there is conflicting testimony as to whether Nurse Lewis accurately read Plaintiff's vitals as normal, and whether she took his vitals a second time after he faked a seizure or whether she simply copied the first vital readings. If true, a reasonable juror could find her actions of giving him Gatorade and Ibuprofen was woefully inadequate treatment in light of

11

Plaintiff's symptoms and complaints as to amount to no treatment at all.  As the Sixth Circuit has stated,

> [P]rison officials may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment. Indeed, deliberate indifference may be established in cases where it can be shown that a defendant rendered "grossly inadequate care" or made a "decision to take an easier but less efficacious course of treatment."

*McCarthy v. Place*, 313 F. App'x 810, 814 (6th Cir. 2008) (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)). Viewing the facts in a favorable light to Abdiasiis, a reasonable juror could determine that Nurse Lewis took an "easier but less efficacious course of treatment" if she copied Plaintiff's earlier vitals rather than taking new vitals and failed to examine Plaintiff because she believed he was faking his symptoms. Nurse Lewis is not entitled to summary judgment on the Eighth Amendment claim.

### ii.    Defendant JaNina Davis, LPN

Defendants argue that Plaintiff cannot establish that Nurse Davis was deliberately indifferent to his serious medical needs because she did not have a culpable state of mind in denying medical care and she actually provided care for Plaintiff based upon his presenting symptoms on September 9th and 10th by giving him Ibuprofen. (Def.'s Mot. at 35–37.)

Plaintiff argues there is a genuine issue as to whether Nurse Davis was deliberately indifferent because she failed to put him on the sick call list, examine him, provide any treatment, and ensure he was seen by the medical provider. (Pl.'s Resp. at 36.) Plaintiff claims the Ibuprofen was prescribed for withdrawal and not as a response to his complaints of abdominal pain. In Davis's deposition, she testified that abdominal symptoms such as vomiting can be very serious. (Davis Dep. II at 156–158, ECF No. 62.) Defendant Davis testified to not remembering whether

Plaintiff gave her verbal or written complaints or whether she examined Plaintiff. She only remembers issuing Ibuprofen.

Taking these facts in a light most favorable to Abdiasiis, a reasonable juror could find that Nurse Davis heard his complaints of severe abdominal symptoms, inferred that they presented a serious risk to him, yet did not provide medical treatment or an examination. A reasonable juror could find that the Ibuprofen administered for Abdiasiis' withdrawal and not for his abdominal symptoms was woefully inadequate treatment in light of his complaints. Therefore, Abdiasiis' and Davis' testimony creates a genuine issue of material fact as to whether Davis perceived a serious medical risk but disregarded it and thus was deliberately indifferent. Nurse Davis is not entitled to summary judgment on this claim.

### iii.   Defendant Cynthia Cameron, RN

Defendants claim there is insufficient evidence that Nurse Cameron was deliberately indifferent to Plaintiff's medical needs because her only interactions with Plaintiff were processing his transfer to Grant Medical Center on September 11th and briefly speaking to Abdiasiis and his mother (through his cellmate) during a three-way call on September 9th. (Def.'s Mot. at 38.)

On September 9th, Nurse Cameron was the Charge Nurse supervising other nurses. She spoke to Plaintiff's mother on the phone and found out that he was vomiting. Later, she was involved in a 3-way call with Plaintiff's mother and Plaintiff or his cellmate. The parties dispute whether Cameron spoke directly with Abdiasiis or only with his cellmate. Cameron chastised Plaintiff or his cellmate for making a 3-way call against jail policy and hung up the phone. Nurse Cameron then reviewed Plaintiff's chart and documented the call. She saw that a sick call referral to a NP/PA evaluation was in the system. Nurse Cameron notified four corrections officers that

Plaintiff had made a 3-way call. The officers threatened to put Plaintiff in isolation and charge him with harassment if he called again.

Plaintiff contends there is a genuine issue of fact as to whether Nurse Cameron was deliberately indifferent to his medical needs because she was aware of his symptoms and that he had not yet been seen by a nurse or advanced practitioner but she did not check on Abdiasiis herself or send another nurse to check on him again. (Pl.'s Resp. at 39.)

In reviewing his patient chart, Nurse Cameron would have seen Plaintiff's multiple sick call requests, his symptoms of severe nausea, hourly vomiting, abdominal pain, chest pain, and back pain. She would have seen that two LPNs (neither of whom are registered nurses or advanced medical practitioners) heard his symptoms and took sick call requests from him. She also was aware that his mother called fifteen times. Yet it is undisputed that Cameron did not check on Plaintiff herself or send another nurse to see him. Under the circumstances, a reasonable juror could find that her inaction was "patently unreasonable." *See Cairelli v. Vakilian*, 80 F. App'x 979, 984 (6th Cir. 2003). Therefore, the Court finds a genuine issue of fact as to whether Nurse Cameron recklessly disregarded the serious medical risk to Plaintiff. Nurse Cameron is not entitled to summary judgment on the Eighth Amendment claim.

### iv. Defendant Elizabeth Givens, LPN

Nurse Givens spoke on the phone with Plaintiff's mother at least twice and knew that Plaintiff's mother called fifteen times, concerned about her son's condition. Plaintiff's mother told Nurse Givens that her son had a panic attack and asked what NaphCare was doing to treat him. Nurse Givens told her she could not divulge Plaintiff's medical information for privacy reasons but that a nurse would check on him. She reported Plaintiff's mother's calls to Nurse Cameron, the supervising Charge Nurse. Unlike the other three Individual Defendants, the record is devoid

14

of evidence that Nurse Givens spoke to Abdiasiis or saw his chart. She was aware of limited information from Plaintiff's mother and reported the calls to her supervisor. From these facts, no reasonable juror could find that she was deliberately indifferent to Abdiasiis' medical needs. Defendant Nurse Givens is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

### 2. Ohio Law Medical Negligence Claim

In addition to the Eight Amendment claim for inadequate medical care, Plaintiff brings a negligence claim against the four Individual Defendants. Under Ohio law, a negligence claim requires proof of (1) a duty requiring the defendant to conform to a certain standard of conduct, (2) breach of that duty, (3) a causal connection between the breach and injury, and (4) damages. *See Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). The elements are the same for medical negligence. *Loudin v. Radiology & Imaging Servs., Inc.*, 128 Ohio St.3d 555, 2011- Ohio-1817, 948 N.E.2d 944, ¶ 13. Medical professionals have a duty to exercise the degree of care that a medical professional of ordinary skill, care, and diligence would exercise under similar circumstances. *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 29, (citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976)) (syllabus). This is called the standard of care. *Id.* In a negligence action involving the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and, that the defendant's negligence was the proximate cause of the patient's injury. *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 592 N.E.2d 828 (1992).

In this case, there is a genuine issue of fact as to whether the Defendants Lewis, Davis, and Cameron were negligent in diagnosing and treating Abdiasiis. Plaintiff's correctional medicine expert, Dr. Lawrence H. Mendel, opines that an "[a]bdominal exam is an essential component of

the evaluation of any patient reporting severe abdominal pain and persistent vomiting" and that "[m]ore likely than not, such an exam and evaluation on September 8, 2019, or at any point in time prior to PA Horton's examination and evaluation on September 11, 2019, by a properly trained medical professional or consultation with a licensed clinician, at a minimum would have identified the need to obtain urgent blood tests that would have identified Abdiasiis' condition within hours." (Mendel Report at 14–15, ECF No. 79-1). However, as detailed above, Defendants Lewis, Davis, and Cameron did not perform an abdominal examination despite Abdiasiis' repeated complaints of severe abdominal pain, vomiting, nausea, and chest and back pain. They marked his condition as "routine" rather than "priority," did not treat him for persistent vomiting, and did not bring him to an advanced practitioner for three days. (*Id.* at 15.) According to Mendel, these actions "failed to meet applicable standards of care" for nurses. (*Id.* at 16–23.) This expert testimony creates a genuine issue of fact as to whether Defendants Lewis, Davis, and Cameron breached their duty of care towards Abdiasiis by failing to act as a medical professional of ordinary skill, care, and diligence would act under similar circumstances. Thus, the first two elements—duty and breach—are met for summary judgment purposes.

Contrary to Defendants' assertion (Def.'s Mot. at 47), Plaintiff provides sufficient evidence of causation and injury through his expert gastroenterologist, Dr. Jonathan Cohen. Dr. Cohen opines that the Individual Defendants' delay in care "resulted [in Abdiasiis] having severe necrotizing pancreatitis and a course complicated by sepsis, SIRS, venous thrombosis, severe diabetes due to loss of viable pancreas, infected fluid collections with pus requiring long term drains, subsequent hospitalizations, and lifelong medical disability." (Cohen Report at 11, ECF No. 79-3.) This is sufficient to create a genuine issue as to whether the Individual Defendants' actions or lack thereof caused Abdiasiis to suffer more complications from pancreatitis and a worse

16

case of pancreatitis than he otherwise would have suffered. Individual Defendants Lewis, Davis, and Cameron are not entitled to summary judgment on Plaintiff's medical negligence claim.

Defendant Givens, on the other hand, is entitled to summary judgment on this claim because there is insufficient evidence that she breached her duty of care to Abdiasiis. Upon receiving calls from Aden, Abdiasiis' mother, she immediately reported them to her supervisor, Nurse Cameron. Cameron is an RN rather than an LPN and is therefore qualified to assess patients, unlike Given, an LPN. The Court finds Givens took reasonable actions that are consistent with what an ordinary LPN nurse would do under the circumstances.

### B. Plaintiff's Claims Against NaphCare

#### 1. Section 1983 Eighth Amendment Claim

To prevail on a cause of action under § 1983, a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010) (internal quotation marks omitted). As to the first element, Plaintiff asserts that NaphCare violated his constitutional right under the Eighth Amendment to be free from cruel and unusual punishment by unnecessarily and wantonly inflicting pain through deliberate indifference to his serious medical needs. *See Shreve v. Franklin Cnty.*, 743 F.3d 126, 133 (6th Cir. 2014). As to the second element, it is well-established that private corporations performing traditional state functions, such as the provision of medical services to prison inmates, act under color of state law for purposes of §1983. *Rouster*, 749 F.3d at 453.

For a corporation such as NaphCare to be held liable under § 1983, Abdiasiis must show that NaphCare itself caused the constitutional violation at issue. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (internal citation omitted) (respondeat superior or vicarious liability does

not attach under § 1983). To do so, the Plaintiff must show NaphCare's customs, practices, or policies led to the constitutional deprivation alleged. *Monell v. New York City Dept. of Social Svs.*, 436 U.S. 658, 694 (1978). Customs or policies can take the form of (1) an official policy or legislative enactment, (2) decisions or ratifications of final decision makers, (3) inadequate training or supervision, or (4) a custom of acquiescence to or tolerance of rights deprivations. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Plaintiff proceeds under the first and third forms— official policies and practices and inadequate training or supervision.

### a.   Official Policy of LPNs Assessing Inmates

Defendants argue that Plaintiff has not established any facts indicating that a NaphCare policy, custom, or procedure led to the alleged denial of medical care. The Individual Defendants' actions were a result of NaphCare's proper polices. (Def.'s Mot. at 44.) Plaintiff responds that the NaphCare system and its practices and unwritten policies "placed excessive and improper reliance on LPNs" and "permitted nurses to make determinations and diagnoses outside the limits of their licenses." (Pl.'s Resp. at 46.)

> As Dr. Jeffery Alvarez, NaphCare's Chief Medical Director, states
>
> LPNs tend to be more focused on medication pass, so delivering medications, administering medications, usually twice a day on a med pass through the housing unit, that's their main focus, it's quite a heavy load so it usually takes up the bulk of their days to do that. LPNs can general assist an RN with some wound care, some general collection of data, and usually that's about the limit of their, you know, they have to have an RN to be able to do any kind of assessments or more complex assessments.
>
> [LPNs can] collect sick calls, it's a health care request, they would collect them during med pass. So the LPNs would do the face to face, just in general collection, and making sure for the prioritization of the health care requests.

(Alvarez Dep. at 35, ECF No. 68 at 36.)

But when asked whether the LPNs assess patients to determine whether there is an emergency situation, Dr. Alvarez states: "When [LPNs are] collecting the health care requests then they need to visualize the person and make sure there's no emergency situation going on." (*Id.*) LPNs decide whether to call a code or pass the information "along to usually an RN to go ahead and do the scheduling and full assessment." (*Id.* at 35.) Dr. Alvarez further states that it is up to the LPN conducting the face-to-face assessment to "determine the time frame for if there's urgency [and] say it needs to be a priority or is this more of a routine follow-up." (*Id.* at 37–38.) NaphCare has boxes for routine care, priority care, and immediate RN nursing care. Routine sick call follow-ups are usually seen within 48 to 72 hours. Priority follow-ups are usually seen within 24 hours. (*Id.* at 40–41.) Nurse Lewis herself believes her duties as an LPN included passing medications to inmates, taking sick call requests, administering treatment, *assessing health status of inmates*, carrying out doctor orders, charting, and triage. (Lewis Dep. at PageID# 4433–37) (emphasis added).

From Alvarez's and Lewis' testimony, the Court finds that a reasonable jury could conclude NaphCare policy permits LPNs to assess patients and determine whether they should be seen immediately, prioritized above others, or not prioritized and only seen for a routine problem, despite the fact that LPNs are not qualified to assess patients.

In this case, Abdiasiis complained orally and submitted many sick call requests to LPNs Lewis and Davis during med passes. Because of NaphCare's protocols, LPNs Lewis and Davis were permitted to assess Plaintiff and designate his medical issue as routine without oversight from a medical provider licensed to assess a patient. Because of NaphCare's protocols, no RN, PA, MD or other medical professional who was licensed to assess a patient visited Abdiasiis for three days. Because he was not seen by a medical provider licensed to assess him three days, Plaintiff's

condition worsened and allegedly caused him additional medical complications. The Court finds sufficient evidence to create a genuine issue as to whether NaphCare's policies led to inadequate assessments and treatments causing him injury.

### b. Inadequate Training and Supervision

To proceed under the inadequate training and supervision *Monell* theory, a plaintiff must show "(1) the training or supervision was inadequate for the tasks performed, (2) the inadequacy was the result of the municipality's deliberate indifference, and (3) the inadequacy was closely related to or actually caused the injury." *Regets v. City of Plymouth*, 568 F. App'x 380, 394 (6th Cir. 2014). Abdiasiis must prove that NaphCare's training program and supervision were inadequate for the tasks the nurses were required to perform, the inadequacy resulted from NaphCare's deliberate indifference, and the inadequacy actually caused, or is closely related to, Abdiasiis' injury. *See Plinton v. Cnty. of Summit,* 540 F.3d 459, 464 (6th Cir. 2008); *Russo v. City of Cincinnati,* 953 F.2d 1036, 1046 (6th Cir. 1992); *City of Canton*, 489 U.S. at 388.

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. at 61 (citing *Bryan Cnty.*, 520 U.S. at 409). Alternatively, Plaintiff can establish "a single violation of federal rights" if he shows that NaphCare "has failed to train its employees to handle recurring situations presenting an obvious potential" for a constitutional violation. *Bryan Cnty.*, 520 U.S. at 409. This second mode of proof is available "in a narrow range of circumstances" where a federal rights violation "may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Id.*

In *Shadrick v. Hopkins*, the Sixth Circuit found a genuine issue of fact as to whether a prison medical care provider "was deliberately indifferent to the need to train and supervise its

LPN nurses to provide adequate medical care to inmates, especially in view of the obvious risk that the Constitution could be violated without such training and supervision." 805 F.3d at 741. In that case, the medical care provider did not implement an ongoing training program for its LPN nurses, there was no proof of training designed to "guide LPN nurses in assessing and documenting medical conditions of inmates, obtaining physician orders, providing ordered treatments to inmates, monitoring patient progress, or providing necessary emergency care to inmates within the jail environment in order to avoid constitutional violations." *Id.* at 740. Instead, the nurses "received a level of medical training" and "obtained a Kentucky license" to practice with a limited set of medical skills. *Id.* The Court noted that the nurses in *Shadwick* could not identify or discuss the medical provider's policies and could not give specific responses as to the content of their training. Furthermore, the LPN nurses had discretion in following protocol. *Id.*

This case is similar to *Shadwick*. Dr. Jeffery Alvarez, NaphCare's Chief Medical Director, states that new NaphCare nurses go through an orientation and a shadowing period in which NaphCare ensures the nurses learn its protocols and policies. (Alvarez Dep. at 203–04.) There is no further indication of training in the record and Court infers that there is no additional training outside of the training reported by Dr. Alvarez. Plaintiff's experts opine that NaphCare failed to train its nurses to know that they cannot diagnose or withhold evaluation or care based on determinations that the patient was "faking" or "lying," failed to train and supervise its nurses "in relation to when and how to appropriately prioritize patients for sick call lists or to make immediate referrals," to "use and/or reference nursing protocols," "concerning when and whose responsibility it is to consult with advanced practitioners," "concerning whether nurses must obtain vitals signs in relation to sick call requests," and failed to train and supervise its nurses "with response to prioritizing and re-prioritizing patients who are placed on sick call lists." (Pl.'s Resp. at 49.) There

is an obvious potential for LPNs to encounter inmates with medical issues they are not qualified to assess and to encounter inmates who may not be faking symptoms. *See Bryan Cnty.*, 520 U.S. at 409. Viewing this in a light most favorable to Plaintiff and drawing all reasonable inferences in his favor, a reasonable juror could find that NaphCare inadequately trained and supervised its LPN nurses.

Plaintiff also provides sufficient evidence of deliberate indifference. As the Court stated in *Shadrick*, "[i]t is predictable that placing an LPN nurse lacking the specific tools to handle the situations she will inevitably confront in the jail setting will lead to violation of the constitutional rights of inmates." *Shadrick*, 805 F.3d at 740. This lack of training led to LPN nurses assessing patients' medical conditions, which is outside their scope of permitted practice. (*See* State of Ohio Board of Nursing Scopes of Practice: RNs and LPNs, Doc. 57-1, PageID#3148.)

Finally, there is sufficient evidence that the lack of training actually caused or is closely related to Abdiasiis' injuries because Plaintiff's experts contend that if an RN or PA assessed Plaintiff instead of an LPN, they would have known his condition was serious and he would have been treated sooner. Defendant NaphCare is not entitled to summary judgment on Plaintiff's Eighth Amendment claims. *See Shadrick*, 805 F.3d at 743–44.

## 2. Negligent Training and Supervision under Ohio Law

Under Ohio law, negligent training and supervision claims require proof of five elements: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing plaintiff's injuries; and (5) the employer's negligence in training or supervising the employee was the proximate cause of the plaintiff's injuries." *Watson v. City of Cleveland*, 202

F. App'x 844 (6th Cir. 2006) (citing *Linder v. Am. Nat'l Ins. Co.*, 155 Ohio App.3d 30, 2003 Ohio 5394, 798 N.E.2d 1190 (2003)).

Defendants argue that they are entitled to summary judgment on this claim because there is no evidence that the Individual Defendants were incompetent or that NaphCare knew they were incompetent. (Def.'s Mot. at 48.) Plaintiff asserts that the Individual Defendants' incompetence is obvious because they failed to reference, follow, or initiate the NaphCare nursing protocols, and because they were not trained how to triage medical requests, a duty they were expected to perform during every med pass. (Pl.'s Resp. at 43–44.) The Court agrees. For the same reasons that NaphCare is liable for failing to train and supervise its employees under §1983, the Court finds a genuine issue of fact as to whether NaphCare is liable for negligently training and supervising its employees under Ohio law.

### 3. Punitive Damages

Defendant contends that Plaintiff is not entitled to punitive damages because there is no evidence of actual malice. (Def.'s Mot. at 49.) To impose punitive damages in regard to Plaintiff's Ohio negligence claims, he must demonstrate that Defendants Lewis, Davis, Cameron, and Givens either acted with "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St. 3d 334, 336, 512 N.E.2d 1174 (1987) (holding that "malice" is required for an award of punitive damages under Ohio law). "[A]ctual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Villella v. Waikem Motors*, 45 Ohio St.3d 36, 37, 543 N.E.2d 464 (1989). Similarly, deliberate indifference is defined as "subjective recklessness." *Farmer*, 511 U.S. at 839. This Court already found sufficient evidence

of recklessness and deliberate indifference. *See supra* III.B.1. Of course, the Plaintiff must provide a certain quantum of proof before a jury will decide punitive damages. Therefore, for the same reasons that Defendants are not entitled to summary judgment on their deliberate indifference claims above, it is not entitled to summary judgment on Plaintiff's request for punitive damages.

## V.     MOTION TO STRIKE

The Federal Rules of Civil Procedure do not provide for a motion to strike documents or portions of documents other than pleadings. *See* Fed. R. Civ. P. 12(f) (limited to striking pleadings or portions of pleadings). Instead, trial courts make use of their inherent power to control their dockets, *Anthony v. BTR Auto. Sealing Sys.,* 339 F.3d 506, 516 (6th Cir. 2003), when determining whether to strike documents or portions of documents. *See also Link v. Wabash R. Co.,* 370 U.S. 626, 630–31 (1962).

Plaintiff's Exhibit 2, Sagal Aden's Contemporaneous Notes, is a document of notes taken by Ms. Aden while her son, Plaintiff Sade Abdiasiis, was incarcerated at Jackson Pike and then hospitalized. (Aden Notes, ECF No. 79-2.) Defendants object to this exhibit, arguing that it is inadmissible hearsay and cannot be considered in resolving their Motion for Summary Judgment. (Def.'s Obj., ECF No. 81.) Plaintiffs responded that the *content* of the notes could be considered for summary judgment, even if it comes in an inadmissible *form*, because Ms. Aden will be able to testify to everything in her notes and her testimony of such is admissible at trial. (Pl.'s Resp. to Def.'s Obj., ECF No. 82.) In Defendants' reply, they argued that the content below from Ms. Aden's notes is not admissible at trial because it is hearsay:

- He was told stop faking the pain.

- @ 12:40pm I called again they said that someone will check on him.

-  I asked pls update the number and nurse refused to do that. She said only Sade can change that.

- It was difficult to get it accepted but Keith asked judge to call jail and Sheriff department. It was all fixed and I was informed to go see my son at the hospital. I went at the waiting are and waited for the nurse to get me. A nurse came and said that there is no family allowed so asked to let officer came and talk to me.

- The officer come out and talk to me and I explained to him the order changes he said wait and let me check with my supervisor. While waiting at the waiting are there comes four officers asking me to leave the hospital. I was escorted out the hospital and called Keith.

(Aden Notes, ECF 79-2.) Thereafter, Plaintiff's filed a Motion to Strike Defendants' Reply on the basis that it identified specific statements from the Notes as hearsay for the first time and therefore addressed new arguments not set forth in the original objection. (Plaintiff's Mot. to Strike, ECF No. 84.)

The Court finds that Defendants' identification of specific statements within Ms. Aden's notes is not a new argument. Defendants are highlighting several notes within the document they already argued were hearsay. Plaintiffs' motion to strike (ECF No. 84) is **DENIED**.

## VI.    CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment (ECF No. 73) and **DENIES** Plaintiff's Motion to Strike (ECF No. 84). Defendant Elizabeth Givens is dismissed from the case. This case remains open.

**IT IS SO ORDERED**.

7/18/2022                                    s/Edmund A. Sargus, Jr.
**DATE**                                     **EDMUND A. SARGUS, JR.**
                                             **UNITED STATES DISTRICT JUDGE**